**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

JOHN G. MERTZ,

CASE NO. 17-cv-10105

        *Plaintiff*,

*v.*                              DISTRICT JUDGE THOMAS L. LUDINGTON
                                     MAGISTRATE JUDGE PATRICIA T. MORRIS

SOCIAL SECURITY ADMINISTRATION,

        *Defendant*.

_____/

**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION FOR**
**SUMMARY JUDGMENT (Doc. 13)**

I.     **RECOMMENDATION**

      For the reasons set forth below, **IT IS RECOMMENDED** that the Court **GRANT**

**IN PART** Defendant's Motion for Summary Judgment, (Doc. 13), because Defendant the

Social Security Administration ("the SSA") has fulfilled its disclosure obligations in

response to Plaintiff John Mertz's request for records under the Freedom of Information

Act (FOIA), 5 U.S.C. § 552, and the Privacy Act, 5 U.S.C. § 552a, and that the Court

**DENY IN PART** Defendant's Motion as to entries JM-008, JM-010, and JM-011, for

which the SSA has failed to prove it has fulfilled its disclosure obligations.

II.     **REPORT**

     **A. Introduction**

      Mertz filed this action under the Freedom of Information Act, 5 U.S.C. § 552, and

the Privacy Act, 5 U.S.C. 552, seeking an order compelling the SSA to produce withheld

documents. (Doc. 1). Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and

by Order of Reference, this case was referred to the undersigned Magistrate Judge. (Doc. 9). The matter is currently before the Court on the SSA's motion for summary judgment. (Doc. 13).

Mertz had previously applied for Social Security disability benefits. (Doc. 13, Ex. 1 at ID 59-60). On October 22, 2015, the SSA sent Mertz a letter indicating it had reviewed deposits into his business account, and on that basis was inquiring into whether he was engaged in substantial gainful activity, which affects eligibility for disability benefits. (*Id.*, Ex. 2—Attachment A: Plaintiff's First Letter to SSA at ID 79); s*ee* 42 U.S.C. § 423(d).

In response, Mertz sent a Freedom of Information Act ("FOIA") request to the SSA seeking "all documents that show and track how the [SSA] received bank statements from Independent Bank account number . . . as stated in your letter to me dated October 22, 2015" regarding his disability benefits claim. (Doc. 13, Ex. 2—Attachment A: Plaintiff's First Letter to SSA). He also sought "copies of all those bank statements," as well as

> all letters and or other written communications between the [SSA] and the Internal Revenue Service, the Department of Justice and or any other U.S. Government Agency during the time period July 2011 through the present date, regarding my Disability claims . . . [and] all memos of any telephone conversations or other oral communications between the employees of the [SSA] and any other U.S. Government Agency during the time period July 2011 through the present date, regarding my Disability claims.

(*Id.*).

On April 6, 2017, "[a]fter the privacy office confirmed the conclusion of that investigation," the SSA made its disclosures. (Doc. 13 at ID 41). Out of 463 pages of responsive records, the SSA disclosed 426 pages and withheld 37 pages, citing FOIA

exemptions 5, 6, 7(C), 7(E), and 3(A). (*Id.*). It also withheld some pages in part. *See* (Doc. 13, Ex. 2—Attachment F: Vaughn Index).

Thereafter, Mertz filed suit against the SSA under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy Act, 5 U.S.C. § 552a. On July 7, 2017, the SSA moved for summary judgment, asserting that it had fulfilled its disclosure obligations and withheld only documents or portions of documents exempted from disclosure. (Doc. 13). Along with its motion, the SSA included a Vaughn index—a routine device through which an agency describes the responsive documents and indicates why it made redactions or withholdings to help the court assess its claims for exemptions from disclosure under the FOIA. (Doc. 13, Ex. 2—Attachment F); *Vaughn v. Rosen*, 484 F.2s 820 (D.C. Cir. 1973). The SSA also attached a declaration ("The Zimmerman Declaration") explaining the nature of the information in each category and the basis for withholding that information. (*Id.*, Ex. 2). On August 4, 2017, Mertz filed a response arguing that the SSA had not fulfilled its obligations, and seeking an order requiring full disclosure of all responsive documents. (Doc. 14). On August 18, 2017, the SSA filed a reply to Mertz's response. (Doc. 15).

### B. Governing Law

#### i. The Privacy Act

When a person requests records about himself from the SSA, it first considers the request under the Privacy Act. (Doc. 13 at 46). The Privacy Act exempts from mandatory disclosure systems of records "maintained by an agency or a component thereof which performs as its principal function any activity pertaining to the enforcement of criminal laws, including police efforts to prevent, control, or reduce crime or to apprehend criminals

. . . ." 5 U.S.C. § 552a(j)(2). Because the SSA's Office of Inspector General is a criminal and regulatory enforcement component of the agency, the investigative records it maintains are exempt from the Privacy Act's access provision. (Doc. 13, Ex. 2 at ID 65); *see* 20 C.F.R. § 401.85(b)(2)(i); Inspector General Act of 1978, 5 U.S.C. Appx. § 6(f).) According to the SSA, the records at issue here were retrieved through a search of the SSA's Office of Inspector General's investigatory records, and thus Mertz "has no individual right of access to these records about himself under the Privacy Act." (Doc. 13 at 46). Mertz does not dispute this. (*See* Doc. 14).

### ii.  The Freedom of Information Act

The FOIA represents a balance struck by Congress "between the right of the public to know and the need of the Government to keep information in confidence[.]" *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (quoting H.R. Rep. No. 1497, 89th Cong., 2d Sess. 6 (1966)). While the FOIA generally requires agencies to search for and release documents responsive to a properly submitted request, the statute also recognizes "that public disclosure is not always in the public interest[.]" *Baldridge v. Shapiro*, 455 U.S. 345, 352 (1982). Accordingly, the FOIA provides nine statutory exemptions to its general disclosure obligation. *See* 5 U.S.C. §§ 552(a)(3), (b)(1)-(b)(9); *see also* 5 U.S.C. § 552(d). Courts must narrowly construe the nine exemptions, *F.B.I. v. Abramson*, 456 U.S. 615, 630 (1982), while also giving them "meaningful reach and application." *John Doe Agency*, 493 U.S. at 152. The burden is on the government to demonstrate that the materials sought may be withheld due to an exemption. *Dep't of Air Force v. Rose*, 425 U.S. 352,

361 (1976); *Vaughn v. United States*, 936 F.2d 862, 866 (6th Cir. 1991); *see also* 5 U.S.C. § 552(a)(4)(B).

When reviewing a motion for summary judgment, the evidence, all facts, and any inferences that may be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*, 475 U.S. 574, 587 (1986). To prevail, the non-movant must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990). A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In a case under FOIA, "[t]o prevail on summary judgment, the government must show that it made a 'good faith effort to conduct a search for the requested records using methods reasonably expected to produce the requested information' and that any withholding of materials was authorized within a statutory exemption." *Rimmer v. Holder*, 700 F.3d 246, 255 (6th Cir. 2012) (quoting *CareToLive v. Food and Drug Admin.*, 631 F.3d 336, 340 (6th Cir. 2011)).

### C.  Standard of Review

Courts review de novo an agency's decision to withhold records. 5 U.S.C. § 552(a)(4)(B); *Rimmer*, 700 F.3d at 255. "Any reasonably segregable portion" of a record must be disclosed, after the deletion of any statutorily exempt portion. 5 U.S.C. § 552(b); *see also Rugiero*, 257 F.3d at 553. The agency bears the burden of explaining why records were not segregable, and must indicate the redactions on the record it produces to the

5

requesting party. *Id.* A court must reach a finding on an agency's segregability determination. *Id.*

### D.  Analysis

Here, Mertz counters the SSA's motion for summary judgment by challenging its assertion of various exemptions to justify its non-disclosure of certain documents: namely, Exemptions 3, 5, 6, 7(C), and 7(E). (Docs. 13, 14).

### i.  Exemption 5

Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Such a record must (1) be from a government agency and (2) "fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001); *see also Lucaj v. Fed. Bureau of Investigation*, 852 F.3d 541, 546 (6th Cir. 2017). As to the first element, a record qualifies if its source is a government agency, regardless of whether it is used within one agency or among multiple agencies.

The second element encompasses both civil discovery privileges and evidentiary privileges such as the attorney-client privilege, the work-product doctrine, and the deliberative process privilege. *Davis & Co. v. Califano*, 623 F.2d 1, 5 (6th Cir. 1980). Exceptions that may be available to civil discovery privileges do not apply to the FOIA, because the test is "whether the documents would be 'routinely' or 'normally' disclosed

upon a showing of relevance." *Fed. Trade Comm'n v. Grolier, Inc.*, 462 U.S. 19, 26 (1983) (citing *Sears, Roebuck & Co.*, 421 U.S. at 148-49).

The vast majority of the SSA's assertions of Exemption 5 arise from attorney-client communications between the SSA'S Office of Inspector General and the Department of Justice. *See* (Doc. 13, Ex. 2, Attachment F). The attorney-client privilege serves to shield confidential communications between a lawyer and client from disclosure either through discovery or at trial. *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). The attorney-client privilege encourages "'full and frank communication between attorneys and their clients and thereby promotes broader public interests in the observance of law and the administration of justice.'" *In re Lott*, 424 F.3d 446, 450 (6th Cir. 2005) (quoting *Swidler & Berlin v. United States,* 524 U.S. 399, 403 (1998)). The Sixth Circuit has recognized that "the attorney-client privilege is a necessary foundation for the adversarial system of justice." *Lott*, 424 F.3d at 450. The elements of the attorney-client privilege are:

> (1) Where legal advice of any kind is sought
> (2) from a professional legal advisor in his capacity as such,
> (3) the communications relating to that purpose,
> (4) made in confidence
> (5) by the client,
> (6) are at his instance permanently protected
> (7) from disclosure by himself or by the legal advisor,
> (8) unless the protection is waived.

*Reed v. Baxter*, 134 F.3d 351, 355-56 (6th Cir. 1998). The privilege does not, however, protect information that is purely factual. *See Upjohn Co. v. U.S.*, 449 U.S. 383, 395-96 (1981).

7

The SSA's Vaughn index contains more than 30 entries asserting Exemption 5 based on the attorney-client privilege.[1] (Doc. 13, Ex. 2, Attachment F). Almost all of those entries indicate the withheld content was an email conversation between at least one DOJ Assistant United States Attorney and one SSA employee; I will address those entries first.

Mertz is correct that "[t]he affidavit supplied by the Social Security Administration regarding its claim of attorney-client privilege gives absolutely no factual information regarding the reason for the communications between the Social Security Administration investigator and the AUSA." (Doc. 14 at ID 125). The attached Vaughn index, however, does, and so I will delve into its descriptions of what the SSA withheld.

Three emails of email conversations withheld under this exception clearly contain content pertaining to legal advice: one "regarding legal aspects of Mertz investigation" (JM-001), one "relating to case developments and questions relating to prosecution of the case" (JM-013), and one "relating to an administrative hearing and information related to that hearing, including procedures to substantiate/investigate information presented at that hearing" (JM-014). I suggest that, on the basis of these descriptions, the Court may conclude that JM-001, JM-013, and JM-014 are protected by the attorney-client privilege.

I turn now to the rest of the entries that encompass an email conversation between an Assistant United States Attorney ("AUSA") and one or more employees of the SSA. These are somewhat less clear-cut: for example, emails "about status of Mertz

---

[1] Namely, JM-001, JM-002, JM-003, JM-004, JM-006, JM-008, JM-009, JM-010, JM-011, JM-012, JM-013, JM-014, JM-015, JM-016, JM-017, JM-018, JM-021, JM-022, JM-024, JM-026, JM-027, JM-028-29, JM-030-31, JM-032-33, JM-034-35, JM-036, JM-037, JM-039-41, JM-042-43, JM-044-45, JM-445-447, and JM-460-463.

investigation" (JM-002, JM-003, JM-004, JM-006, JM-008, JM-009), an email "relating to case developments" (JM-011, JM-012), "three emails between SSA OIG agent and DOJ AUSA . . . containing bank records attachments produced later" (JM-015, JM-016, JM-017), an email "relating to coordination of meetings" (JM-018), and an email "regarding status of case report" (JM-026). A swath of the emails appear largely to concern investigative matters: emails "relating to investigation activity" (JM-021), "relating to investigation of subject" (JM-022), "related to the coordination of investigative activities" (JM-024), "regarding updates on reports associated with the investigation of the subject" (JM-027), emails "regarding the unredacted email from the subject's attorney" (JM-028-29, JM-034-035), "regarding coordination of investigative activities and possible charges" (JM-030-31), "regarding coordination/strategy of investigative activities" (JM-032-33), and "regarding coordination/strategy of investigation and investigative activity" (JM-036, JM-037, JM-039-41, JM-042-43, JM-044-45). The SSA does not use the words "legal advice" to describe the contents of these emails, but this should not necessarily bar it from asserting the attorney-client privilege—as the U.S. Supreme Court recognized in *Upjohn*, "[t]he first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant." *Id.* at 390-91. Here, the SSA has made clear that the withheld emails were communications with a federal prosecutor that concerned developments in the investigation of and decision whether to pursue legal action against Mertz. Thus, I suggest the Court find the SSA's aforementioned withholdings authorized under the FOIA's Exemption 5 and the attorney-client privilege.

A few entries for which the SSA asserted the attorney-client privilege, however, appear to lack a crucial element: JM-008's second email is a "[c]ase update between another federal agency and DOJ"; JM-010 is "[e]mail between SSA OIG agent and another federal employee"; JM-011 is "[e]mail between SSA and DOJ;" JM-445-447 is an "SSA OIG Report of Investigation"; and JM-460-463 is "SSA OIG Report of Investigation" for which the privilege is asserted to exempt only the "[r]easons for declination." (*Id.* at ID 93, 94, 111). Nowhere does the SSA indicate that either the sender or recipient of any of these items was a professional legal advisor acting in his or her official capacity, or even an agent of a professional legal advisor. I therefore suggest that the SSA has not provided sufficient information about those three entries for this Court to conclude that they fall within the ambit of the attorney-client privilege.

The rest of the SSA's assertions of Exemption 5 are instead based in the deliberative process privilege. This privilege must be both "predecisional" and "deliberative": "A document is predecisional when it is received by the decisionmaker on the subject of the decision prior to the time the decision is made, . . . and deliberative when it reflects on the give-and-take of the consultative process." *Norwood v. Fed. Aviation Admin.*, 993 F.2d 933, 940 (6th Cir. 1988) (quoting *Schell v. Dep't of Health and Human Servs.*, 843 F.2d 933, 940 (6th Cir. 1988). The "key issue" is whether disclosure would "'expose an agency's decisionmaking process in such a way as to discourage discussion within the agency and thereby undermine the agency's ability to perform its functions.'" *Rugiero v. U.S. Dep't of Justice*, 257 F.3d 534, 550 (6th Cir. 2001) (quoting *Dudman Communications Corp. v. Dep't of the Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987)).

10

The district court must be aware of "how each document fits into the deliberative process" and whether it is an "essential element of that process." *Park, Davis & Co. v. Califano*, 623 F.2d 1, 6 (6th Cir. 1980). As an alternative to *in camera* review—which the Sixth Circuit encourages courts to use sparingly—the government may submit "a detailed affidavit" entitled to a presumption of good faith. *U.S. ex rel Williams v. Renal Care Group, Inc.*, 696 F.3d 518 (6th Cir. 2012). The affidavit is sufficient if it describes "the content of the material withheld and adequately states its grounds for nondisclosure, and if those grounds are reasonable and consistent with the applicable law . . . ." *Rugiero*, 257 F.3d at 543-44.

The SSA's brief offers little explanation of why the SSA withheld certain documents subject to this exception, except for implying that they were somehow involved in "[t]he predecisional give-and-take over the investigation and strategy and the decision not to prosecute." (Doc. 13 at ID 48). The Zimmerman Declaration is of no more help; it merely restates that the "SSA has identified two applicable civil discovery privileges: the attorney-client privilege and the deliberative process privilege," and again regurgitates the rule for each privilege. (Doc. 13, Ex. 2 at ID 68).

Thankfully, a review of the Vaughn index proves more illuminating. The SSA identifies the deliberative process privilege as shielding only two of its withheld documents. The first, JM-005, is described as "[e]mails between SSA OIG agent and SSA employee dated 3/10/15 and 11/25/14 about status of Mertz investigation, investigation activities, and decisions made/rationale relating to decisions in case," and the deliberative process exemption is specifically asserted to "protect the pre-decisional process of

government employees who were discussing aspects of the Mertz investigation and the back-and-forth discussion between employees about strategies of the investigation." (Doc. 13, Ex. 2, Attachment F at ID 91). The second is JM-460-463, "SSA OIG Report of Investigation," which "[c]ontains [a] summary of investigative activity of SSA and other law enforcement arms of the United States." (*Id.* at ID 111). The deliberative process privilege is specifically asserted for the portion of the report dealing with the "[r]easons for declination." (*Id.*).

But this fails to satisfy Mertz, who argues that the SSA is required to describe "'(1) the nature of the specific deliberative process involved, (2) the function and significance of the document in that process, and (3) the nature of the decisionmaking authority vested in the document's author and recipient.'" (Doc. 14 at ID 127) (quoting *National Security Counselors v. CIA*, 960 F.Supp.2d 101, 189 (D.D.C. 2013) (internal citations omitted). I was unable to find any evidence that the Sixth Circuit has chosen to follow the D.C. Circuit in adopting this standard for Exemption 5 as regards the deliberative process privilege. I suggest the Court decline to now hold the SSA to this more rigorous standard.

Instead, I suggest that the Vaughn index satisfies the requirements of the deliberative process privilege as the Sixth Circuit knows it—that is, the index describes "the content of the material withheld and adequately states its grounds for nondisclosure," and "those grounds are reasonable and consistent with the applicable law." *Rugiero*, 257 F.3d at 543-44. The SSA has described the emails in JM-005 as containing "the predecisional process of government employees who were discussing aspects of the Mertz investigation and the back-and-forth discussion between employees about strategies of the

investigation." (Doc. 13, Ex. 9 at ID 91). The emails are dated February 10, 2015, and November 25, 2014—thus, judging by the SSA letter dated June 6, 2016, that described the investigation as "ongoing," both emails were sent before the investigation into Mertz had reached its conclusion. (Doc. 13, Ex. 2, Attachment D). It follows that the emails described in JM-005 fall squarely within the deliberative process privilege.

Likewise, the deliberative process privilege should cover JM-46-463, the SSA OIG Report of Investigation, but only so far as it includes "[r]easons for declination." The privilege does not, after all, protect "purely factual, investigative matters." *See, e.g.*, *Environmental Protection Agency v. Mink*, 410 U.S. 73, 87-91 (1973). In sum, I suggest the Court find the SSA's two withholdings under the FOIA's Exemption 5 and the deliberative process privilege to be authorized.

### ii.  Exemptions 6 and 7(C)

Mertz also takes issue with the SSA's assertion that it may withhold some materials under the FOIA's Exemption 6 and Exemption 7(C)—specifically, the SSA has asserted these exemptions to protect names and other identifying information in every entry in the Vaughn index. *See* (Doc. 13, Ex. 2—Attachment F). Exemption 6 protects information about individuals in "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). A court applying Exemption 6 must balance the individual's right to personal privacy against the public's interest in shedding light on the agency's performance. *Rose*, 425 U.S. at 372; *Schell*, 843 F.2d at 938.

Exemption 7(C) applies to "records or information compiled for law enforcement purposes" when disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Exemption 7(C) requires much the same balancing of individual privacy interest against public interest as Exemption 6, but "the standard for evaluating the threatened invasion of privacy interests resulting from the disclosure of records compiled for law enforcement purposes is somewhat broader than the standard applicable to personnel, medical, and similar files." *U.S. Dep't of Justice v. Reporters Comm. For Freedom of the Press*, 489 U.S. 749, 756 (1989).

Under the Sixth Circuit's per se rule, any documents that a law enforcement agency compiles meet Exemption 7(C)'s threshold requirement that the records be compiled for law enforcement purposes. *Rugiero*, 257 F.3d at 550 (citing *Jones v. Federal Bureau of Investigation*, 41 F.3d 238, 245 (6th Cir. 1994)). The SSA's Office of Inspector General is a law enforcement agency, 5 U.S.C. Appx. § 6(f), and Mertz does not dispute the SSA's assertion that "the records responsive to [P]laintiff's FOIA and Privacy Act request were compiled for law enforcement purposes." (Doc. 13 at ID 50). Where the records at issue were compiled for law enforcement purposes, the Sixth Circuit has analyzed the application of Exemptions 6 and 7(c) together under the more protective terms of 7(c). *Rimmer*, 700 F.3d at 256. I will follow the same strategy here.

The SSA asserts that it relied on Exemptions 6 and 7(C) in redacting the names and identifying information of five types of people:

(1) third-party individuals of investigative interest or who might or did provide information for the investigation;

14

(2) names and identifying information of Office of Inspector General agents and personnel;
(3) non-SSA federal government personnel;
(4) third parties merely mentioned in the records; and
(5) third parties who provided information to the Office of Inspector General."

(Doc. 13 at ID 51). The Zimmerman Declaration contains some further explanation. According to the SSA, the people whose names and identifying information it has protected have a privacy interest—for example, "in being protected from unnecessary, unofficial questioning as to the conduct of this or other investigations," (Doc. 13, Ex. 2 at ID 70), or from the reveal "that these third parties were connected in some way to an SSA investigation." (*Id.* at ID 71). On the other hand, the SSA asserts, the public interest in disclosure here is "non-existent" because disclosure "will not shed light on the operations and activities of" the SSA. (Doc. 13, Ex. 2 at ID 71-72).

Mertz attacks the SSA's assertion of this privilege on both fronts. First, Mertz argues that there is "a clear public interest in the public knowing who is working for them and how they are conducting the business of the government. There is an interest in increasing the public understanding of the operations or activities of the government." (Doc. 14 at 119). But Mertz goes still further, insisting it "seems likely that some wrongdoing occurred during the investigation of Plaintiff by the Social Security Administration" and that thus disclosure of the employees involved would serve the public interest. (*Id.*).

Mertz's rationale for suspecting wrongdoing, however, does not quite pass muster. A plaintiff seeking disclosure under FOIA needs more than "bare allegations of federal malfeasance" to overcome the privacy concerns embodied in Exemption 7(C). *Rimmer*,

700 F.3d at 258. The Supreme Court has indicated that for a public interest to be significant enough to tip the scales toward disclosure, a FOIA requester must, at a minimum, "produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred." *Id.*

Here, Mertz stands on 26 U.S.C. 6103—arguing that "[t]he IRS is not supposed to be giving out its information to other governmental agencies"—and an oversimplified reading of Federal Rule of Criminal Procedure 6(c)(3)(A)(ii). He asserts that "[i]f information protected by Grand Jury secrecy . . . was given to the Social Security Administration, then there could have been wrongdoing unless a court approved the disclosure." (Doc. 14 at 120). He continues: "Grand Jury information [is not] supposed to be broadcasted outside the U.S. Attorney's office." He ignores entirely the provision under which an attorney can disclose grand jury information "to any government personnel . . . that an attorney for the government considers necessary to assist in performing that attorney's duty to enforce federal criminal law," even without seeking prior approval from a court. Fed. R. Crim. P. 6(c)(3)(A)(ii). The attorney need only "promptly provide the court that impaneled the grand jury with the names of all persons to whom a disclosure has been made, and must certify that the attorney had advised those persons of their obligation of secrecy under this rule." Fed. R. Crim. P. 6(3)(B). It is also possible that the SSA's Office of Inspector General received his bank records through an inspector general's subpoena. Or the Office of Inspector General may have conducted its own investigation using a grand jury. Mertz fails to acknowledge any of these possible scenarios, and produces no evidence

16

that elevates his claim above "bare allegations of federal malfeasance." *Rimmer*, 700 F.3d at 258.

Next, Mertz argues that "[r]eleasing the identity or name of a government employee is not an unwarranted invasion of personal privacy." (*Id.*) He speaks generally: "People go around every day and tell people what they do for a living and who they work for." (Doc. 14 at ID 124). But as the SSA points out, the Sixth Circuit has held that a privacy interest exists in names and other identifying information, even when that information is already publically available. *Rugiero*, 257 F.3d at 550. And federal courts have consistently found that individuals identified in law enforcement files—including investigators, other government employees, suspects, witnesses, informants, and private citizens—have substantial privacy interests. *E.g.*, *Rimmer v. Holder*, 700 F.3d 246, 257 (6th Cir. 2012) ("[P]eople who were investigated for suspected criminal activity or who were otherwise mentioned therein . . . could [be] subject[ed] to embarrassment, harassment and even physical danger.") (citing *Kiraly v. F.B.I.*, 728 F.2d 273, 277 (6th Cir. 1984)); *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1173-74 (D.C. Cir. 2011) (noting the court has "long recognized" that "'witnesses, informants, and . . . investigating agents' have a 'substantial interest' in ensuring that their relationship to the investigations 'remains secret'") (quoting *Fitzgibbon v. CIA*, 911 F.2d 755, 767 (D.C. Cir. 1990)); *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1115 (D.C. Cir. 2007) ("[T]he exemption protects the privacy interests of all persons mentioned in law enforcement records, whether they be investigators, suspects, witnesses, or informants."); *Halpern v. FBI*, 181 F.3d 279, 297 (2d Cir. 1999) (holding that FBI agents and other government employees have an interest against the disclosure of their

17

identities to the extent that disclosure might subject them to embarrassment or harassment in their official duties or personal lives); *Jones v. F.B.I.*, 41 F.3d 238, 246-47 (6th Cir. 1994) ("This circuit has previously found that federal law enforcement officials 'have the right to be protected against public disclosure of their participation in law enforcement investigations pursuant to exemption (b)(7)(C).") (quoting *Ingle*, 698 F.2d at 269); *Fitzgibbon v. CIA*, 911 F.2d 755, 767 (D.C. Cir. 1990) (recognizing that "the mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation."); *New England Apple Council v. Donovan*, 725 F.2d 139, 142 (1st Cir. 1984) (collecting cases); *Librach v. FBI*, 587 F.2d 372, 373 (8th Cir. 1978) (holding that the release of third-party personal information contained in law enforcement records was "a clearly unwarranted invasion of personal privacy").

Mertz has failed to raise more than a specter of government impropriety. On the other hand, the SSA argues convincingly that disclosure of the withheld names and personal information "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). As *Ray* stated, "Mere speculation about hypothetical public benefits cannot outweigh a demonstrably significant invasion of privacy." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 179 (1991). I therefore suggest the Court should find that the SSA's withholdings under FOIA's Exemptions 6 and 7(C) were authorized.

As a final matter, Mertz also complains that "there is no reason not to disclose" information on the bank statements from Professional Corporation to Mertz, "as his personal activity created the information in the first place." But "rights under the [FOIA]

are neither increased nor decreased by reason of the fact that [a litigant] claims an interest in the [requested records] greater than that shared by the average member of the public." *National Labor Relations Bd. V. Sears, Roebuck & Co.*, 421 U.S. 132, 143 n.10 (1975). Thus, Mertz's argument should be unavailing.

### iii.   Exemption 7(E)—Law Enforcement Techniques and Procedures

Mertz goes on to challenge the SSA's withholdings under the FOIA's Exemption 7(E).[2] Exemption 7(E) protects records and information compiled for law enforcement purposes that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).

The SSA asserts this exemption for three types of information, as explained in the Zimmerman Declaration: First, "to protect the focus of this specific investigation. Revealing the broader investigative focus of SSA's Office of Inspector General could reveal its priorities and its strategies for preventing and disrupting criminal conduct. Release of this information could allow criminals to gauge SSA's Office of Inspector General's strengths and weaknesses, the better to avoid detection." (Doc. 13, Ex. 2 at ID 72-73).

---

[2] The SSA makes withholdings under Exemption 7(E) in JM-005, JM-006, JM-007, JM-011, JM-014, JM-017, JM-021, JM-024, JM-026, JM-027, JM-030-31, JM-032-33, JM-036, JM-046-47, JM-048-49, JM-050, JM-051, JM-052-53, JM-055-56, JM-057-58, JM-060, JM-426-430, JM-431-433, JM-434-436, JM-437-444, JM-445-447, JM-448-450, JM 451-453, JM-454-456, JM-457-459, and JM-460-463.

Second, the "SSA also applied this exemption to protect the process and methodology for its Office of Inspector General's investigative interviews and other investigative activity, the purpose and scope of its investigative subpoenas, and communications with the Department of Justice. This information could similarly be used to evade detection and to diminish the efficacy of future investigations." (*Id.* at ID 73).

Third, the "SSA also applied this exemption to sensitive case file numbers . . . which are not known to the general public. Releasing these files number [sic] in the context of investigative records could allow criminals to understand SSA's Office of Inspector General's focus and efforts and its allocation of limited investigative resources. This could allow criminals to seek to exploit any weaknesses or forewarn them as to how to avoid detection. In short, releasing sensitive file numbers could potentially reduce SSA's efficacy and enable a criminal to circumvent the law." (*Id.*).

The Vaughn index provides some additional details about the materials that the SSA seeks to protect under this exception: for example, a half-paragraph "identifying and discussing process for interviewing certain individuals," (*id.* at ID 92), multiple subpoena requests, (*id.* at 103-06), and several SSA OIG reports that contain a "summary of investigative activity of SSA and other law enforcement arms of the United States" (*id.* at ID 106-11). The index also indicates with greater specificity what information the SSA withheld within the SSA OIG reports, including case numbers, "investigatory plans," "information about the interview," the names of government employees, banks, people interviewed, and "third parties," "other information related to law enforcement

investigations or prosecutions," "rationale relating to decision in case," and "reasons for declination [to prosecute]." (*Id.* at ID 106-11).

Apparently having overlooked the Zimmerman Declaration, Mertz asserts: "Nowhere does the Social Security Administration claim that disclosure of the law enforcement techniques would compromise future investigations. . . . There is no specific allegation that any of the techniques sought to be exempted are secret and have to remain secret in order to conduct further investigations." (Doc. 14 at 128). But the SSA devoted three paragraphs in its Zimmerman Declaration to alleging just that. Thus, again, Mertz's argument is unavailing, and I suggest the Court find SSA's withholdings under Exemption 7(E) were authorized.

### iv.  Exemption 3

Next, Mertz challenges the SSA's withholding of information under the FOIA's Exemption 3.[3] Exemption 3 exempts information from disclosure when another federal statute prohibits its disclosure, provided that either the statute "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue," or the statute "established particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3); *see Rugiero*, 257 F.3d at 549.

Here, the SSA explains that it "withheld federal grand jury information pursuant to Exemption 3." (Doc. 13 at ID 55). Federal Rule of Criminal Procedure 6(e) dictates strict secrecy requirements for grand jury proceedings, and "[c]ourts have unanimously held that

---

[3] The SSA withholds under this exemption portions of JM-431-433, JM-434-436, JM-437-444, JM-454-456, and JM-460-463.

Rule 6(e) . . . constitutes a statute under § 552(b)(3) of the FOIA so that an agency may withhold grand jury materials." *Rugiero*, 257 F.3d at 549. The SSA's Zimmerman Declaration explains that the withheld records "contain information about how grand jury information is prepared, stored, and retained, and about what information the grand jury subpoenaed as part of its investigation." (Doc. 13, Ex. 2 at ID 74). The SSA resists disclosure because, it argues, "[a]ny disclosure of this information would violate the secrecy of the grand jury proceedings, because it could reveal the inner workings of the grand jury, the direction that the grand jury was taking, its focus and scope, and the direction of its investigation." (*Id.*).

Rather than engage with the standard of Exemption 3, Mertz instead argues the SSA cannot assert this exemption because it should never have had withheld federal grand jury information in the first place. "It is believed that the disclosure of the Grand Jury information to the Social Security Administration was improper," he states. "The Grand Jury had nothing to do with the investigation of Plaintiff for violations of the Social Security Act." (Doc. 14 at ID 129). Mertz does not elaborate on his foundation for this belief.

For reasons explained *supra*, Mertz's allegation of government misconduct is unconvincing. In any event, Mertz advances no legal basis for his contention that an alleged wrongful disclosure of grand jury materials should mandate further disclosure under this exemption. I would therefore suggest the Court find that the SSA's withholdings under Exemption 3 were authorized.

### v.  Segregation

Finally, Mertz makes a brief argument that the SSA "has not shown any proof that information in the files cannot be segregated and released." (Doc. 14 at 129). The FOIA requires that "[a]ny reasonably segregable portion of [the] record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. 552(b). The agency bears the burden of explaining why records were not segregable. *Rugiero*, 257 F.3d at 544. A court must reach a finding regarding an agency's segregability determination. *Id.*

The SSA states that it "reviewed the records withheld in full under Exemptions 5, 6, 7(C), 7(E), or 3(A), alone or in combination with other cited exemptions, and concluded that no reasonably segregable, nonexempt information was withheld from Plaintiff." (Doc. 13 at ID 55). The Zimmerman Declaration explains that, for the materials that the SSA released only in part, "[t]he protected material was either exempt itself or was so intertwined with non-exempt information that segregation of the non-exempt information was not reasonably possible without revealing exempt information or leaving nothing but meaningless words and sentence fragments." (Doc. 13, Ex. 2 at ID 74-75). As for pages that the SSA withheld entirely, it did so

> in order to protect exempt information. SSA concluded that all information on these pages was either fully covered by one or more cited FOIA exemptions, or that any non-exempt information on these pages was so inter[t]wined with exempt materials that no information could reasonably be segregated for release. Any further segregation of these intertwined materials would employ finite resources only to produce disjointed words, phrases, or sentences that, taken together or separately, would have minimal or no informational content.

23

(*Id.* at ID 75).

In *Schiller v. NLRB*, the D.C. Circuit Court criticized the NLRB because its *Vaughn* index and affidavits discussed withheld memoranda without "correlat[ing] the claimed exemptions to the particular passages in the memos." *Schiller v. NLRB*, 964 F.2d 1205, 1209 (D.D.Cir. 1992), *abrogated on other grounds*, *Milner v. Dep't of Navy*, 562 U.S. 561 (2011). The Court explained that the withholding agency must "supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and *correlating those claims with the particular part of a withheld document to which they apply*." *Id.* at 1210 (quoting *King v. United States Dep't of Justice*, 830 F.2d 210, 224 (D.C. Cir. 1987) (emphasis in *Schiller*)). Here, the SSA has done just that. Where a document was withheld either in part or in full, the SSA's Vaughn index describes what information within the document was withheld and under which exemption. For example, in an email between an SSA OIG agent and an SSA employee, the SSA withheld information "regarding investigative development" under Exemption 7(E), and it withheld the name(s) of individual(s) interviewed during the investigation and the names and contact information of government employees under Exemptions 6 and 7(C). (Doc. 13, Ex. 2 at ID 92). Mertz appears to have no cause for complaint. I would suggest, therefore, that the Court find that the SSA sufficiently explained its segregability determinations.

### E.  Conclusion

For the reasons explained above, I suggest that the Court find the SSA has satisfied its disclosure obligations as to all relevant documents except JM-008, JM-010, and JM-011, and thus I suggest that the Court grant in part the SSA's Motion for Summary

24

Judgment, denying the motion insofar as it pertains to documents JM-008, JM-010, and JM-011.

## III.  REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); see also 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled

as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court

determines that any objections are without merit, it may rule without awaiting the response.

Date: December 21, 2017            S/ PATRICIA T. MORRIS
                                   Patricia T. Morris
                                   United States Magistrate Judge


## **CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date
through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: December 21, 2017            By s/Kristen Castaneda
                                   Case Manager